# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

RAYMOND J. BERGERON DAVILA,

         Plaintiff,

v.

BARBARA A. TEELING, BRAD
FRIEND, MELISSA MORAN,
ANTHONY LACOMBE, GREGORY
BUCHOLTZ, ROBERT A.
MASTRONARDI, STEVEN M.
CLOPE, and NICOLE L. PETERSEN,

         Defendants.

Case No. 17-CV-337-JPS

**ORDER**

## 1.      INTRODUCTION

On May 23, 2017, the Court screened Plaintiff's complaint. (Docket #11). The complaint alleges that Plaintiff was mistreated in various ways while he was incarcerated at the Racine County Jail (the "Jail"). Plaintiff was allowed to proceed on four claims. The first two, for cruel and unusual punishment and conducting an unreasonable search, arose from a body cavity search conducted on Plaintiff. *Id.* at 3–5. The other two claims, for deliberate indifference to Plaintiff's self-harming activities and intentional discrimination against him, stemmed from Plaintiff biting the inside of his mouth while in a restraint chair. *Id.* at 5–8. Plaintiff was later given leave to amend his complaint to name a few new defendants, but his claims did not change. (Docket #28).

On February 20, 2018, Defendant Gregory Bucholtz ("Bucholtz"), a Wisconsin Department of Corrections jail inspector, filed a motion for summary judgment. (Docket #106). The remaining defendants, various

employees of the Jail ("Defendants"), filed their own summary judgment motion two days later. (Docket #110). Plaintiff responded only to Defendants' motion. (Docket #122) (Plaintiff's response brief directed only at Defendants, making no mention of Bucholtz); (Docket #125) (Plaintiff's response to Defendants' statements of fact). Bucholtz's motion thus stands unopposed and it will be granted on that basis. Civ. L. R. 7(d); *Hill v. Thalacker*, 210 F. App'x 513, 515 (7th Cir. 2006) (noting that district courts have discretion to enforce procedural rules against *pro se* litigants). The Court is left to address only Defendants' motion. For the reasons explained below, it must be granted.[1]

## 2. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[1]Plaintiff has filed multiple motions for leave to submit sur-replies to Defendants' summary judgment motion. (Docket #140 and #143). Those motions will be denied. The Court expects that litigants will comply with the rules of procedure and provide all of their arguments within the constraints of the briefing permitted by those rules. Indeed, Plaintiff filed a substantially overlong response brief without asking for leave to do so. (Docket #122) (49-page response brief); Civ. L. R. 56(b)(8)(A) (principal briefs are limited to 30 pages). The Court could have struck the brief but, in light of Plaintiff's *pro se* status and the fact that his brief is handwritten, it chose to show leniency. The Court sees no reason to extend that generosity to allow further excess briefing. The same is true for other various motions by Plaintiff related to the evidence the parties submitted with their summary judgment materials. (Docket #144 and #145) Each is a meaningless distraction from the merits of the summary judgment motion and will likewise be denied.

242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

### 3.    RELEVANT FACTS

The following facts are material to the disposition of Defendants' motion. They are drawn from the parties' factual briefing, (Docket #111 and #125), unless otherwise noted. The Court will discuss the parties' principal factual disputes as appropriate. The Court notes that it has otherwise disregarded as improperly presented many of Plaintiff's attempted disputes of Defendants' proposed facts.[2]

---

[2]For example, Defendants assert that the Jail has a suicide prevention policy that is used when dealing with a suicidal inmate. (Docket #111 ¶ 23). Plaintiff says he disputes that fact because Defendants did not physically intervene to stop his biting activity on June 16, 2016. (Docket #125 ¶ 23). As support for his dispute, Plaintiff cites only to his own affidavit wherein he describes the incident. (Docket #124 ¶ 27). Nowhere in his response to Defendants' statement of facts or his affidavit does Plaintiff indicate which provision of the 22-page suicide prevention policy was not followed during this incident. The Court cannot construct arguments on litigants' behalf, even when they proceed *pro se*. *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001). The Court must, therefore, disregard this attempted dispute. For brevity's sake, the Court will not engage in a similar discussion for each of Plaintiff's many improper attempted disputes of fact, unless the attempted dispute is material to the Court's analysis.

Relatedly, after the summary judgment briefing had concluded, Plaintiff filed a rambling motion seeking to clarify or correct certain aspects of his briefing. (Docket #129). Plaintiff states that he has various mental illnesses and takes various medications which impede his ability to concentrate. *Id.* He asks that the Court appoint him counsel to "fix" his filings. *Id.* The Court has already denied a prior motion for appointment of counsel. (Docket #53). To the extent the instant motion seeks to renew that request, it must be denied. As the Court explained to Plaintiff many months ago, appointment of counsel may be made if 1) he has made reasonable attempts to secure counsel himself, and 2) the case exceeds his capacity to present it. *Id.* at 1; *Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir. 2007). Plaintiff does

### 3.1 Background

The Jail employs a suicide prevention policy to deal with suicidal inmates. Once an inmate has been identified and assessed as a possible suicide risk, steps are taken to protect the inmate from self-harm. Jail staff members remain alert for indications of possible suicide risk including, but not limited to, talk of suicide or actual physical harm or attempts to harm oneself. Though the policy provides that officers will make an incident report following any suicide attempt, Plaintiff notes that many of the officers involved in his June 16, 2016 biting incident did not write such a report.

An inmate who has been placed on suicide watch status may only be removed from such status by the recommendation of mental health staff. Inmates may be further classified as "suicide close watch" ("SCW"), which involves additional suicide prevention measures. These include putting the inmate in a suicide gown and removing all personal items from their cell,

---

not satisfy either element. As to the first, he makes no mention of any attempts to retain counsel on his own. As to the second, while Plaintiff's submissions are not the picture of clarity, the Court has largely been able to understand his positions and locate relevant evidence within his submissions. Plaintiff suggests that various medications and medical diagnoses have interfered with his ability to litigate. Plaintiff fails, however, to present any medical evidence supporting these statements. In any event, Plaintiff's submissions demonstrate a firm grasp of his claims and the evidence underlying them. Plaintiff's motion for appointment of counsel will, therefore, be denied.

Finally, Plaintiff filed yet another request for appointed counsel on August 29, 2018, claiming that he needs a lawyer to help him obtain medical records from the hospital where the cavity search occurred. (Docket #168). Plaintiff further suggests that he needs expert medical testimony to evaluate the x-rays that were taken of him at that time. *Id.* The motion will be denied. It comes far too late; discovery in this case closed long ago and the parties' summary judgment motions were fully briefed months ago. If Plaintiff had concerns about his submissions, they needed to be raised during the discovery period or at time the motions were being briefed.

save for a suicide-proof blanket and mattress. SCW inmates are monitored by officers at least every fifteen minutes, who then note the inmate's status in the inmate's activity log.

Plaintiff has a lengthy history of disruptive and self-harming behavior while at the Jail. This includes spitting blood, threatening staff with harm and occasionally attacking them, damaging Jail property, and escaping various forms of restraints. Plaintiff has also threatened Jail staff with future lawsuits. In one instance, officers confronted Plaintiff about scratching himself with a metal object and determined that he should be placed in the restraint chair. As they transported him there, Plaintiff said "[g]et ready for the lawsuit I am stealing all your money bitch." *See, e.g.*, (Docket #114-2).[3] From August 2015 to June 2016, Plaintiff engaged in hundreds of self-harming incidents requiring at least ten hospital visits.

Plaintiff was, unsurprisingly, placed on SCW status at the Jail. In light of his particular problems, the Jail employed additional procedures for

---

[3]Plaintiff says he disputes Defendants' characterization of his behavioral history, but he cites no evidence in support. (Docket #125 ¶ 35). Instead, he says that "[P]laintiff has a right to counsel in the face of criminal allegations and also exercises his right to remain silence [sic] until appointed counsel regarding [the allegations]." *Id.* Assuming this is an invocation of the right to avoid self-incrimination under the Fifth Amendment, it fails to genuinely dispute the matter for two reasons. First, there is no evidence that Plaintiff's assertion of the right is proper. To invoke one's right to silence in a civil case, "the answer one would give if one did answer it (and answer it truthfully) must have some tendency to subject the person being asked the question to criminal liability." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663–64 (7th Cir. 2002). There is nothing to suggest that Plaintiff's behavior, while disruptive and manipulative, would subject him to criminal consequences. Second, asserting the right does not help Plaintiff here. A court may apply a negative inference against a person invoking the Fifth Amendment as to the subject matter about which they refused to answer. *Evans v. City of Chi.*, 513 F.3d 735, 740–41 (7th Cir. 2008). The Court sees no reason not to apply such an inference here.

Plaintiff alone. This included stricter movement controls and, eventually, round-the-clock one-on-one monitoring. Plaintiff's cell was also modified to reduce the possibility that he could obtain implements therein to facilitate self-harm.

### 3.2    June 9, 2016 Cavity Search

On June 8, 2016, an officer noticed Plaintiff cutting his arm with something while in his cell. Though he was asked to stop, Plaintiff turned away from the guard and continued. Additional officers and Defendant Brad Friend ("Friend"), a supervisor, responded to the scene. An officer saw Plaintiff put an object in his mouth before Friend and the others could enter Plaintiff's cell and secure him. As they spoke with Plaintiff, the officers could tell that something was in his mouth.

Friend asked Plaintiff to spit the item out. When Plaintiff initially refused, Friend said that he would obtain a warrant to conduct a body cavity search. Plaintiff says that he then spit the item out. This assertion is based on his own testimony and the fact that no contraband was recovered from the search performed the next day. Defendants maintain that he did not spit out the object. Plaintiff was placed in the Jail's emergency restraint chair ("ERC") for his safety and security.

Friend then prepared an affidavit in support of a request for a search warrant. The affidavit recounts various incidents where Plaintiff harmed himself using small objects and threatened to hurt others. Friend noted that during the incident earlier that day, Plaintiff stated that he had metal objects in his mouth and underneath his skin, and that he intended to use them to hurt himself. Plaintiff reiterates that he gave up his contraband, and thus Friend had lied in the affidavit when he claimed that Plaintiff had contraband and presented a danger to himself and Jail security. Based on

Friend's affidavit, a Racine County Circuit Court judge found probable cause for the search. A warrant for the search was issued later that day. The warrant commanded that an x-ray and cavity search be performed by medical personnel.

Plaintiff was taken to the hospital the next morning. Plaintiff was escorted by two officers and Defendant Anthony LaCombe ("LaCombe"), another Jail supervisor. LaCombe says that he went along only to document the incident, but Plaintiff claims that he did much more. According to Plaintiff, LaCombe told the medical staff that he had items hidden in his rectum. Plaintiff asserts that he told everyone—the officers, LaCombe, and the medical staff—that he had no contraband. Defendants counter that Plaintiff was given ample time to review the warrant and had no questions about it.

Medical staff proceeded to conduct the search. They first x-rayed Plaintiff. Plaintiff claims that the x-ray was negative for contraband, but that LaCombe nevertheless instructed medical staff to continue with a cavity search. Plaintiff further states that, prior to the cavity search being performed, LaCombe made comments to him about the search suggesting that it was intended to humiliate him rather than discover contraband. *See* (Docket #124 ¶ 44). LaCombe denies giving any direction to medical staff on how to execute the warrant. The cavity search was conducted by a doctor and likewise did not turn up any contraband. Plaintiff and the officers returned to the Jail.

### 3.3    June 16, 2016 Self-Harm Incident

Early in the morning on June 16, 2016, an officer observed Plaintiff kneeling on the floor of his cell. Due to Plaintiff's behavioral history, the officer believed that he was harming himself or seeking objects with which

to do so. The officer called for help and moved in closer to Plaintiff's cell. He saw Plaintiff digging into his forearm with a small metal object. Plaintiff was ordered to stop but ignored the command. Plaintiff cut off a piece of skin and put it on the plexiglass cell window. Plaintiff was also seen with another hard object, apparently pencil lead.

A number of other officers, including Defendants Robert A. Mastronardi ("Mastronardi") and Melissa Moran ("Moran"), moved in to help control Plaintiff. Plaintiff put the objects in his mouth. He complied with the officers' request to lay on his bunk, but refused to give up the items from his mouth. A spit mask was placed over Plaintiff's mouth and medical staff arrived to treat his forearm cut. Plaintiff made a number of statements indicating his intention to continue his self-harming behavior that day. Prior to the other officers' arrival, Plaintiff said that "this was suppose [sic] to be the big bang today," which he later explained meant that he wanted to cut his arm such that it would bleed profusely. *See* (Docket #114-2 at 220–22).

For Plaintiff's safety and security, he was taken to the ERC. The ERC was placed in one of the Jail's observation cells in the intake area. Plaintiff physically resisted being strapped into the chair but was eventually secured. Medical personnel checked Plaintiff's vital signs and the tightness of his straps. Defendant Steven M. Clope ("Clope"), another Jail officer, conducted regular SCW checks on Plaintiff approximately every fifteen minutes. Medical staff also observed Plaintiff's condition regularly, about every hour from 8:00 a.m. until 3:00 p.m.

Beginning at about noon, Plaintiff was observed biting his lip and cheeks. The spit mask had apparently been removed, as Plaintiff proceeded to spit blood all over the cell. Officers entered the cell to assess Plaintiff and

asked to see the inside of his mouth. He opened his mouth to reveal a small puncture wound on his cheek. Defendants state that Clope was the only defendant involved at this stage. Plaintiff avers that Moran, Mastronardi, and Defendants Barbara A. Teeling ("Teeling") and Nicole L. Petersen ("Petersen") were all in the intake area, observed Plaintiff's behavior, and could have intervened to stop it.

A nurse was called to perform a medical assessment. The nurse concluded that Plaintiff's self-inflicted injuries did not require hospitalization. Friend was advised of the situation at about 2:30 p.m. Friend attempted to talk to Plaintiff, but Plaintiff continued to bite himself. Medical staff tried to evaluate Plaintiff again at around 2:40 p.m., but he would not open his mouth. After Plaintiff's refusal, they informed the security staff that Plaintiff should be taken to the hospital.[4]

Officers transported Plaintiff to a local hospital at approximately 3:00 p.m. The hospital's medical staff cleaned off the dried blood from Plaintiff's body. As discussed further below, the parties dispute the extent of Plaintiff's injuries. Plaintiff says he bit off a portion of his lip. The physician assistant who evaluated Plaintiff, Daniel Teska ("Teska"), noted only mild abrasions on the inside of his cheek. Plaintiff's injuries did not require stitches; Teska said they would heal on their own. Plaintiff was cleared to return to the Jail.

---

[4]Plaintiff attempts to dispute whether he refused to be seen by the medical staff at this time. (Docket #125 ¶ 64). The evidence he cites does not support his dispute. His affidavit testimony suggests that the security staff ignored him but says nothing about his interactions with the medical staff. (Docket #124 ¶ 27). Medical records, as well as an incident report prepared by Clope, confirms Plaintiff's intransigence with medical personnel. (Docket #114-8 at 26–28; Docket #114-2 at 232).

## 4.   ANALYSIS

As noted above, Plaintiff proceeds on four claims. The first two stem from the June 9, 2016 body cavity search. The next two claims relate to the biting episode of June 16, 2016. The Court will begin by addressing the first two claims together, and then the third and fourth claims in turn.[5]

### 4.1   June 9, 2016 – Cruel and Unusual Punishment and Unreasonable Search

Plaintiff brings two claims with respect to the June 9 cavity search, for which he holds both Friend and LaCombe responsible. First, Plaintiff alleges that the cavity search was unreasonable, and thus violated his rights under the Fourth Amendment. Second, Plaintiff maintains that the search was motivated solely by a desire to harass and humiliate him, in violation of his right to be free of cruel and unusual punishment under the Eighth Amendment.

---

[5]The Prison Litigation Reform Act requires that inmates exhaust their administrative remedies within a prison system before they may bring a claim to court. 42 U.S.C. § 1997e(a). This is an affirmative defense to be pleaded and proven by a defendant. *Pavey v. Conley*, 544 F.3d 739, 740-41 (7th Cir. 2008). Defendants originally asserted that Plaintiff failed to exhaust his administrative remedies as to all of his claims. (Docket #112 at 13–15). After the parties traded a seemingly unending series of motions, counter-motions, memoranda, and exhibits, Defendants agreed to withdraw their assertion of the exhaustion defense. (Docket #165). Each of those exhaustion-related motions will be denied as moot. (Docket #128, #132, #139, #148, and #152).

Long after these motions were exchanged and Defendants withdrew their exhaustion defense, Plaintiff filed a motion for sanctions, suggesting that Defendants pursued the defense knowing it was bogus. (Docket #169). The motion will be denied. The parties simply disagree as to whether Plaintiff exhausted his remedies. Nothing in Defendants' submissions suggests that they presented the defense in bad faith. Defendants appear to have withdrawn the exhaustion defense because they did not want to bear the expense of a hearing on the matter. *See* (Docket #162).

The Court begins with the Fourth Amendment claim. The Fourth Amendment protects persons from unreasonable searches. U.S. Const. amend. IV. Searches done pursuant to warrants are presumptively reasonable. *Archer v. Chisholm*, 870 F.3d 603, 613–14 (7th Cir. 2017). As described above, Plaintiff's case deals with a warrant-based search. Even warranted searches may run afoul of the Fourth Amendment, however.

There are two facets of reasonableness to consider in warrant cases. First is the issuance of the warrant. *Guzman v. City of Chi.*, 565 F.3d 393, 396 (7th Cir. 2009). A warrant is only valid if it is supported by probable cause and describes with particularity the things to be searched. *Id.* Warrants must generally be issued by a neutral magistrate. *Id.* Once armed with a valid warrant, government officials must properly execute it. *Id.* at 397. Officials may not go beyond the bounds determined by a warrant or execute one which they know is ambiguous. *Id.*; *Jones v. Wilhelm*, 425 F.3d 455, 462–63 (7th Cir. 2005).

As relevant to Plaintiff, a prisoner's right to be free of invasive searches "is significantly lessened by punitive purposes of prison and the very real threats to safety and security of prisoners, correctional staff, and visitors." *King v. McCarty*, 781 F.3d 889, 900 (7th Cir. 2015). Nevertheless, "the Fourth Amendment protects, to some degree, prisoners' bodily integrity against unreasonable intrusions *into* their bodies." *Id.* (emphasis in original). In assessing whether a cavity search is reasonable, courts consider the scope of the intrusion, the manner in which it was conducted, the justification for the intrusion, and the place where it was conducted. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Courts must also "give considerable deference to judgments of prison officials about matters of institutional

safety and security," though "the deference is not complete." *King*, 781 F.3d at 899.

Evaluated against all of these standards, the cavity search did not offend the Fourth Amendment. Preliminarily, Plaintiff's right to privacy was largely trumped by the Jail's security and safety interests. The Court must also defer to the Jail's approach to such matters, as its staff, not the Court, are the experts in correctional activity. Mindful of these issues, which lessen the already low probable cause requirement, the Court concludes that the warrant was validly issued. Friend's application recounted Plaintiff's safety and security threats. It noted that Plaintiff not only had objects in his mouth, but also under his skin. The warrant was issued by a Racine County Circuit Court judge, who agreed that probable cause existed for the search, and directed that medical personnel perform both an x-ray and cavity search.

The warrant was also appropriately executed. Plaintiff was transported to the hospital, where both the x-ray and cavity searches were conducted by medical staff. Considering the *Bell* factors, while the search was certainly invasive, it was animated by safety and security concerns, and was completed in as comfortable and neutral an environment as possible. In sum, the cavity search was the result of a valid, reasonably executed warrant. It did not, therefore, violate the Fourth Amendment. *See Rodriques v. Furtado*, 950 F.2d 805, 809–11 (1st Cir. 1991) (as a general matter, "a manual body cavity search conducted by a licensed physician, in a private and hygienic setting and medically approved manner, pursuant to a warrant issued on probable cause" in not unreasonable); *Everett v. Witcher*, 65 F. App'x 153, 154 (9th Cir. 2003) (similar, further holding that the search did not violate either the Fourth or Eighth Amendments); *Spencer v. Roche*,

659 F.3d 142, 148 (1st Cir. 2011) (a prior negative manual cavity search does not dispel probable cause for a more complete x-ray search); *but see United States v. Booker*, 728 F.3d 535, 545–547 (6th Cir. 2013) (manual rectal examination done without a warrant, and after the plaintiff had to be sedated and intubated without consent his, was unreasonable).

Plaintiff offers various contrary assertions on this issue, none of which change the result. Plaintiff maintains that he spit out the contraband he had hidden in his mouth, eliminating the basis for the search. For two reasons, no reasonable jury could find that he did so. First, the assertion is based solely Plaintiff's affidavit testimony, which is contradicted by every other piece of evidence, including the incident reports by non-defendant officers. It is beyond belief that Defendants would continue to pursue the warrant and search if Plaintiff had given up the contraband at the outset.

More importantly, Plaintiff's contention that he spit out the contraband is entirely new at this point in this case. It was never even suggested, much less expressly alleged, in either of his lengthy, detailed, and verified complaints. (Docket #1 at 7–14, 21–26; Docket #29 at 7–13, 20–25). Rather, the entirety of his claim had, to date, been based on the fact that the x-ray was "negative," which Plaintiff believes meant he was free of contraband. *See, e.g.*, (Docket #1 at 25) ("[P]laintiff alleges Defendant Friend's search warrant lacked probable cause the moment hospital staff medically cleared that Plaintiff was free of contraband and by x-ray imaging and no more probable cause existed to continue, thus, any further of a search would be illegal at that point[.]").

This glaring difference between Plaintiff's prior and current positions evokes the sham affidavit rule. That rule prohibits litigants from manufacturing issues of fact with affidavits that contradict their prior

sworn testimony. *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009). Otherwise, the ability of a court on summary judgment to "weed out unfounded claims, specious denials, and sham defenses—would be severely undercut." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168–69 (7th Cir. 1996). While not directly contradictory, it is clear that the difference is not due to a simple lapse in memory between time the complaint and the present affidavit were drafted. Rather, Plaintiff's extensive and meticulous filings, combined with his legal savvy, as shown by both his litigation experience and his manipulative threats of lawsuits, leads to one conclusion—Plaintiff contrived the surrender of the contraband in preparing his opposition to summary judgment. No reasonable jury could infer otherwise.

Plaintiff further states that because no contraband was found, the warrant and resultant searches must be considered invalid. This is incorrect. Searches regularly fail to turn up evidence and yet do not violate the Constitution. Rather, the only relevant inquiry is whether the search was properly supported before it was executed. As discussed above, the search was authorized by a valid warrant. The lack of results is immaterial.

In the same vein, Plaintiff contends that the "negative" x-ray proves that the subsequent cavity search should not have been performed. Plaintiff has not, however, produced any evidence of what the x-ray showed or why it was considered "negative." Plaintiff's belief, in turn, implicates LaCombe's alleged malicious statements, which Plaintiff says prompted medical personnel to continue with the cavity search. Again, however, he lacks evidence to support his theory. Plaintiff testifies that medical personnel "cleared Plaintiff from contraband announcing negative x-rays." (Docket #125 ¶ 52). What the medical staff told him is hearsay. Fed. R. Evid.

801(c). Plaintiff has not produced the x-rays themselves or the medical records reflecting the interpretation of the x-rays. Finally, the overarching problem for Plaintiff is that the search warrant demanded both an x-ray and a body cavity search. Neither LaCombe nor the medical staff went beyond what the warrant permitted. Plaintiff's Fourth Amendment rights were not infringed.

The Court now turns to the Eighth Amendment claim. As noted above, the Court permitted Plaintiff to proceed on a claim of cruel and unusual punishment with respect to the cavity search. (Docket #11 at 4–5; Docket #28 at 1). In their summary judgment briefing, the parties have characterized the claim as one of excessive force. (Docket #112 at 1; Docket #122 at 1). The excessive force analysis is not a good fit for this scenario; Plaintiff was not being unruly, and no officers applied any force to him. The Court will, therefore, analyze the claim as it was screened: as one of alleged cruel and unusual punishment.[6]

As previously noted, prisoners' rights to privacy and to be free of government searches are drastically lessened compared to those of regular citizens. A strip or cavity search of a prisoner can nevertheless constitute cruel and unusual punishment when it is done "by a desire to harass or humiliate rather than by a legitimate justification, such as the need for order and security in prisons." *King*, 781 F.3d at 897. *King* further explains:

---

[6]The Court may have been the source of the parties' confusion. The screening order initially analyzes the claim as one of cruel and unusual punishment. (Docket #11 at 4–5). However, in recounting the various claims upon which Plaintiff could proceed, the Court said that the claim was for "[e]xcessive force in causing the cavity search to be performed, in violation of the Eighth Amendment." *Id.* at 8. Despite the Court's typographical error, the screening order's analysis must control.

Even where prison authorities are able to identify a valid correctional justification for the search, it may still violate the Eighth Amendment if conducted in a harassing manner intended to humiliate and cause psychological pain. In short, where there is no legitimate reason for the challenged strip-search or the manner in which it was conducted, the search may involve the unnecessary and wanton infliction of pain in violation of the Eighth Amendment.

*Id.* (citation and quotations omitted).

For many of the same reasons discussed above, Plaintiff has not adduced evidence sufficient to create a triable issue on whether the cavity search violated the Eighth Amendment. Defendants had a clear penological justification for the search. The warrant, approved by a neutral judge, further solidified the appropriateness of the search. Plaintiff says that Friend and LaCombe's only motivation was to humiliate him, and taken as true, LaCombe's comments at the hospital are deplorable. However, the harassing nature of the search is not borne out in the record. The search was done in accordance with the warrant's instructions and was carried out solely by medical personnel, in the privacy of a hospital room. While certainly uncomfortable and intrusive, no reasonable jury could find that the cavity search served no legitimate purpose.

**4.2     June 16, 2016 – Fourteenth Amendment Due Process**

When the Court screened Plaintiff's complaint, it allowed him to proceed on an Eighth Amendment claim for deliberate indifference to his serious medical needs in relation to the June 16 incident. This was not quite accurate. Convicted prisoners' access to medical care is protected by the Eighth Amendment. However, as of June 2016, Plaintiff was merely a pretrial detainee. Thus, his right to medical care arose through the

Fourteenth Amendment Due Process Clause, rather than the Eighth Amendment. At the time of screening, this was a distinction without difference; courts applied the same standards to a claim about inadequate medical care, regardless of the underlying constitutional basis. *Whiting v. Marathon Cnty. Sheriff's Dep't*, 382 F.3d 700, 703 (7th Cir. 2004).

Just last month, the Seventh Circuit held that based on the Supreme Court's 2015 *Kingsley* decision, this was no longer appropriate. *Miranda v. Cnty. of Lake*, No. 17-1603, 2018 WL 3796482 (7th Cir. Aug. 10, 2018); *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). Convicted prisoners are properly subject to punishment. The Eighth Amendment proscribes only punishment of a "cruel and unusual" variety. That standard is quite difficult for plaintiffs to meet. *Miranda*, 2018 WL 3796482, at *9. *Miranda* explains that

> [p]retrial detainees stand in a different position: they have not been convicted of anything, and they are still entitled to the constitutional presumption of innocence. Thus, the punishment model is inappropriate for them.
> . . .
> That said, we have typically assessed pretrial detainees' medical care (and other) claims under the Eighth Amendment's standards, reasoning that pretrial detainees are entitled to at least that much protection. In conducting this borrowing exercise, we have grafted the Eighth Amendment's deliberate indifference requirement onto the pretrial detainee situation. Missing from this picture has been any attention to the difference that exists between the Eighth and the Fourteenth Amendment standards.
>
> The Supreme Court recently disapproved the uncritical extension of Eighth Amendment jurisprudence to the pretrial setting in *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). There the Court held that a pretrial detainee bringing an excessive-force claim did not need to prove that the defendant was subjectively aware

that the amount of force being used was unreasonable. *Id.* at 2472–73. Rather, the plaintiff needed only to show that the defendant's conduct was objectively unreasonable. *Id.*

*Miranda*, 2018 WL 3796482, at *9. (citations omitted). After discussing the positions that other circuits have taken on *Kingsley*, *Miranda* concluded that *Kingsley*'s logic should extend to Fourteenth Amendment claims regarding medical care, not just claims of excessive force. *Id.* at *11. *Miranda* then explained the contours of this approach:

> The defendants here worry that an objective-reasonableness standard will impermissibly constitutionalize medical malpractice claims, because it would allow mere negligence to suffice for liability. A careful look at *Kingsley*, however, shows that this is not the case; the state-of-mind requirement for constitutional cases remains higher.

> Here is what the Court had to say about this problem in *Kingsley*:

>> We consider a legally requisite state of mind. In a case like this one, there are, in a sense, two separate state-of-mind questions. The first concerns the defendant's state of mind with respect to his physical acts—i.e., his state of mind with respect to the bringing about of certain physical consequences in the world. The second question concerns the defendant's state of mind with respect to whether his use of force was "excessive." Here, as to the first question, there is no dispute. As to the second, whether to interpret the defendant's physical acts in the world as involving force that was "excessive," there is a dispute. We conclude with respect to that question that the relevant standard is objective not subjective. Thus, the defendant's state of mind is not a matter that a plaintiff is required to prove.

> 135 S.Ct. at 2472. As applicable here, the first of those inquiries asks whether the medical defendants acted purposefully,

knowingly, or perhaps even recklessly when they considered the consequences of their handling of Gomes's case. *See id.* at 2472, 2474 (discussing purposeful or knowing conduct and leaving open the possibility that recklessness would also suffice). The courts of appeals that have applied *Kingsley* to detainees' claims in contexts other than excessive force have taken that step, while continuing to recognize that it will not be enough to show negligence or gross negligence. [*Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)] (under *Kingsley*, a detainee must "prove more than negligence but less than subjective intent—something akin to reckless disregard" (quoting [*Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016)]); accord [*Darnell v. Pineiro*, 849 F.3d 17, 36 & n.16 (2d. Cir. 2017)]. As *Kingsley* instructs, the second step is the objective one.

*Id.* at *12. Finally, *Miranda* applied these rules to the facts presented:

> The allegations here easily fit the mold of *Gordon*, *Darnell*, and *Castro*. A properly instructed jury could find that Drs. Elazegui and Singh made the decision to continue observing Gomes in the jail, rather than transporting her to the hospital, with purposeful, knowing, or reckless disregard of the consequences. (The jury could also reject such a conclusion.) It would be a different matter if, for example, the medical defendants had forgotten that Gomes was in the jail, or mixed up her chart with that of another detainee, or if Dr. Elazegui forgot to take over coverage for Dr. Kim when he went on vacation. Such negligence would be insufficient to support liability under the Fourteenth Amendment, even though it might support state-law liability. Here, there is evidence that Drs. Elazegui and Singh deliberately chose a "wait and see" monitoring plan, knowing that Gomes was neither eating nor drinking nor competent to care for herself. *See* [*Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017)] (recognizing inaction as a choice). Because the Estate does not claim merely negligent conduct, a jury must decide whether the doctors' deliberate failure to act was objectively reasonable.

*Id.*

As controlling precedent in this area, the Court is bound to apply *Miranda* rather than the old rule of equivalence between the Eighth and Fourteenth Amendments. Toward that end, the Court must determine whether a genuine dispute of material facts exists as to whether Defendants' conduct was objectively reasonable. To make this assessment, the Court considers whether the evidence suggests that Defendants "acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [Plaintiff's self-harming behavior]." *Id.* If this question is answered in the affirmative, the Court then asks whether a reasonable jury could potentially find that Defendants' conduct was unreasonable.

A preliminary consideration colors—in fact, dominates—the Court's analysis of those two elements. Plaintiff's self-harming behavior did not present a serious medical emergency. For about three hours, he bit the inside of his mouth and spit blood throughout the observation cell. He was under the watchful eye of both guards and medical staff the entire time. Indeed, multiple sets of medical personnel found nothing particularly wrong with Plaintiff. The Jail's medical staff evaluated him once and determined that hospitalization was not necessary. They eventually sent him to the hospital only because Plaintiff refused to let them see the inside of his mouth. Once at the hospital, Teska found that Plaintiff had only "edema and mild abrasions" on his cheek, without "laceration or [a] bleeding wound." (Docket #114-8 at 22). Teska determined that Plaintiff "ha[d] not sustained any significant injuries to [the] inside of [his] mouth[.]" *Id.* at 24. Rather than showing that Plaintiff had an obvious or medically diagnosed injury, the evidence reveals that quite the opposite was true.

Plaintiff's argument to the contrary is unavailing. He says that he did in fact sustain a significant injury during the biting episode, namely by biting off a portion of his lip. For the next ten days, this injury allegedly caused him substantial pain, interfered with his ability to eat, and made it difficult to speak. (Docket #122 at 42–43; Docket #125 ¶ 67). The primary basis for Plaintiff's contention is his own testimony on the matter and an affidavit from Douglas Wearing ("Wearing"), another Jail guard. Wearing produced the affidavit on June 17, 2016 in an effort to obtain authorization from the Racine County Circuit Court to perform an involuntary medical evaluation of Plaintiff. (Docket #124-1 at 84–86). Wearing recounted Plaintiff's self-harming history since August 2015 to support his request. *Id.* He further stated that the June 16 incident resulted in Plaintiff "bit[ing] away a portion of his lower lip[.]" *Id.* Plaintiff also points to pictures of his bloody cell to suggest that his injury was worse than Teska believed. In the same vein, a June 18, 2016 observation note from a Jail guard stated that in speaking with Plaintiff, who was being manipulative and combative at the time, "recent self inflicted injuries to [his] cheecks/mouth/lips [sic] caus[ed] some changes in speech[.]" *Id.* at 100.

Plaintiff's evidence would not permit a reasonable jury to find in his favor on this issue. First, neither he nor Wearing is a doctor. The actual medical personnel were unanimous in their assessment that Plaintiff had no meaningful injuries. Surely a bitten off lip would not have escaped their notice. Further, the fact that the observation cell was bloody and that guards noticed a speech impediment two days after the biting incident is not proof that he had bitten off his lip or suffered any injury beyond what Teska observed. Plaintiff points to no other medical evidence to establish that he injured himself in the manner he describes.

With this in mind, no reasonable jury could believe that Defendants' response to Plaintiff's behavior came close to recklessness. That is to say, no reasonable juror could conclude that any of the Defendants actually believed that Plaintiff was at a genuine risk of taking his own life and that this might occur imminently. Again, from their perspective, Plaintiff was merely chewing on the inside of his mouth. While this generated a substantial amount of blood, which Plaintiff proceeded to spew around the cell, Defendants did not ignore Plaintiff. They checked on him regularly throughout the incident. Additionally, medical personnel assessed Plaintiff's condition each hour. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (prison guards are entitled to defer to the care provided by medical personnel so long as the prisoner is not ignored). At no time was Plaintiff in a state where he could, or actually came close to, causing himself serious injury or death.

This determination is reinforced by Plaintiff's undisputed behavioral history at the Jail. Plaintiff has a track record of nearly constant disruptive and threatening behavior. He spits on guards, threatens Jail staff with violence, has actually attacked them on occasion, and fights against his restraints. Plaintiff's behavior is also manipulative. He taunts Jail personnel with lawsuits during instances of self-harm, strongly suggesting that the conduct is motivated by spite and a desire for secondary gain, rather than genuine suicidal ideations.

Defendants were entitled to have this history in mind when responding to the June 16 biting incident, namely by tempering their intervention in light of the relatively minor self-inflicted damage Plaintiff was causing to himself. The thrust of Plaintiff's briefing is that Defendants should have interceded more forcefully, physically holding his head and

jaw still to prevent him from biting himself. Not only is Plaintiff not in a position to dictate how Jail staff respond to his behavior, *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011), but his desired approach might generate more, rather than fewer, constitutional concerns. Cynically, Plaintiff's argument could be viewed as an attempt to generate additional lawsuits beyond the seven he has already filed against Jail staff since December 2015. In any event, Defendants had a valid basis to curtail their response to Plaintiff's biting behavior. Their approach was not objectively unreasonable.[7]

### 4.3    June 16, 2016 – Intentional Discrimination

The Equal Protection Clause of the Fourteenth Amendment protects individuals from discrimination by the government on the basis of their membership in a particular class. *Geinosky v. City of Chi.*, 675 F.3d 743, 747 (7th Cir. 2012). Typically the class is one of race, national origin, or sex. *Id.* However, the Equal Protection Clause also guards against governments "singling out just one person for different treatment for arbitrary and irrational purposes." *Id.* Known as "class of one" claims, these require proof that the plaintiff "had been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Enquist v. Ore. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (quotation omitted).

In their opening brief, Defendants argued that Plaintiff lacks the evidence necessary to bring his class of one claim before a jury. (Docket #112

---

[7]Defendants further assert that certain of them were not personally involved in the relevant events of June 16 such that they could appropriately bear constitutional liability. (Docket #112 at 21). In light of the Court's disposition of the claim on other grounds, it need not reach this contention.

at 25–26). He has both failed to identify a similarly situated inmate or show that Defendants lacked a rational basis to treat Plaintiff differently than others. *Id.* Both of these contentions stem from the same fact—Plaintiff was indeed treated differently than others not for arbitrary reasons, but because he *needed* special treatment. *Id.* Namely, Plaintiff has an extensive history of disruptive and self-harming behavior which required Jail officials to give him particularly close attention. *Id.*

Plaintiff's response brief offers no defense of his class-of-one claim. *See generally* (Docket #122). He mentions the claim in his introduction but makes no further comments upon it in the remaining 48 pages of his brief. *Id.* at 1. The Court cannot fashion arguments on behalf of litigants, even those proceeding without counsel. *Anderson*, 241 F.3d at 545. The Court must, therefore, treat Defendants' position as conceded and grant their motion as to the class of one claim. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (Failure to respond to an argument—as the Bontes have done here—results in waiver.").

**5.    CONCLUSION**

Bucholtz's motion must be granted because Plaintiff chose not to oppose it. Further, on the undisputed facts presented, summary judgment is appropriate in the other Defendants' favor on Plaintiff's claims against them. The Court must, therefore, grant both motions and dismiss this action with prejudice.

Accordingly,

**IT IS ORDERED** that Plaintiff's motions for leave to file sur-replies (Docket #140 and #143) and motions related to summary judgment evidence (Docket #144 and #145) be and the same are hereby **DENIED**;

**IT IS FURTHER ORDERED** the parties' ancillary motions related to the exhaustion of remedies defense (Docket #128, #132, #139, #148, and #152) be and the same are hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for sanctions (Docket #169) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's motions for appointment of counsel (Docket #129 and #168) be and the same are hereby **DENIED**;

**IT IS FURTHER ORDERED** that the motion for summary judgment of Defendant Gregory Bucholtz (Docket #106) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the motion for summary judgment of Defendants Barbara A. Teeling, Brad Friend, Melissa Moran, Anthony Lacombe, Robert A. Mastronardi, Steven M. Clope, and Nicole L. Petersen (Docket #110) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 25th day of September, 2018.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge